IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JAN GARBETT,<br><br>   Plaintiff,<br><br>v.<br><br>GARY HERBERT, in his official capacity as Governor of Utah, and SPENCER COX, in his official capacity as Lieutenant Governor of Utah,<br><br>   Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**<br><br>2:20-cv-245-RJS<br><br>Chief District Judge Robert J. Shelby |

   Plaintiff Jan Garbett is seeking the Republican Party nomination for Utah's 2020 race for governor.  The first step is getting on the Republican primary ballot.  There are two ways to do that under Utah law.  One way is selection by state party delegates at the Utah Republican Party's convention.  But because she classifies herself as a "Trump-skeptical" Republican and state party delegates ordinarily gravitate toward more conservative candidates, Garbett hesitated to pursue the convention route.  And when the Utah Republican Party announced it would use the same state delegates from 2018 rather than selecting new delegates for the 2020 convention—thereby precluding Garbett from organizing her own supporters to become delegates—Garbett considered the convention route impossible.

   That left her the second option—obtaining and submitting to Lieutenant Governor Spencer Cox 28,000 signatures from registered Utah Republicans by April 13, 2020.  Garbett was ostensibly on track to reach the signature threshold when a novel coronavirus (COVID-19) quickly developed into a global pandemic and dramatically changed everyday life.  After nearly all public events in Utah were either postponed or cancelled as a result of the outbreak, coupled

with Governor Herbert's eventual "Stay Safe, Stay Home" directive, Garbett was forced to cease almost all her signature gathering efforts.  When the April 13 deadline arrived, Garbett had obtained only about 21,000 of the required 28,000 signatures.  But for the State's directives and refusal to modify the signature gathering requirements, Garbett argues she easily would have obtained enough signatures to appear on the primary ballot.  When the Lieutenant Governor's Office refused to accept her signatures, Garbett filed this lawsuit.

Now before the court is Garbett's Motion for Preliminary Injunction, in which she argues the State's ballot access framework—in conjunction with the State's emergency measures to respond to the COVID-19 crisis—violates her associational rights under the First Amendment and her right to equal protection under the Fourteenth Amendment.  She asks the court to direct Lieutenant Governor Cox to include her on the ballot or to require the state to give her additional time to obtain signatures after state and local governments lift their stay at home orders.  Defendants Governor Herbert and Lieutenant Governor Cox (collectively, the State) contend the lawful enforcement of Utah's election laws does not violate any of Garbett's constitutional rights, even in the midst of a pandemic.  Having considered and applied the relevant standards, the court GRANTS IN PART Garbett's Motion.

## BACKGROUND

The following facts are drawn from the parties' papers, the evidence submitted in advance of the injunction hearing, and from the representations made during oral argument. These facts are largely undisputed by the parties.[1]

---

[1] Both Garbett and the State lodge minor challenges to each other's characterization of a handful of facts, but their disputes are not material to the court's decision.

2

I.      **Garbett's Decision to Run for Governor of Utah and Ensuing Efforts to Collect Signatures**

Garbett decided to run for governor as the Republican Party's nominee in February 2020.[2]  To obtain a place on the Republican Party primary ballot, Garbett could pursue two nonexclusive routes.  She could be selected by state delegates at the Utah Republican Party's convention (the Convention Route), submit to the lieutenant governor 28,000 signatures of registered Republican voters (the Signature-Gathering Route), or pursue both paths.[3]  At the time candidates declare their candidacy, they must indicate whether they are seeking the nomination through the Convention Route, the Signature-Gathering Route, or both.[4]

Because Garbett classifies herself as a "Trump-skeptical" candidate, she worried the Convention Route might not be a viable option.[5]  Garbett ultimately decided her most likely path to getting on the primary ballot was through the Signature-Gathering Route.[6]  To qualify through that path, Garbett had until April 13, 2020, to collect the required signatures.[7]

Before settling on that route, however, Garbett sought to ensure she had time to collect the signatures before the April 13 deadline.[8]  After soliciting bids from various signature-

---

[2] Dkt. 6, Ex. 1 ¶ 7 (hereinafter, Garbett Decl.).

[3] *See* Utah Code Ann. §§ 20A-9-407, 20A-9-408.

[4] *See id.* § 20A-9-408.5(3).

[5] *See* Garbett Decl. ¶ 12.  Garbett explains: "In 2018, Mitt Romney—a Trump-skeptic Republican—only garnered 49 percent of the delegate vote in Republican convention compared to 51 percent for his pro-Trump challenger, despite Romney's high levels of general name recognition and support in Utah.  In the Republican 2018 primary election, Romney then easily beat this same opponent 71 to 29 percent."  *Id.*

[6] *Id.* ¶¶ 11–12.

[7] *See* Utah Code Ann. § 20A-9-408(8)(b).  Utah law gives candidates from January 1, 2020, until five p.m. fourteen days before a qualified party's convention is held to collect signatures.  The Utah Republican Party convention was held Saturday, April 25, 2020.  Because the deadline falls on a weekend (Saturday, April 11, 2020), the deadline is extended to the following business day (Monday, April 13, 2020).  *See id.* § 20A-1-104(3)(b)(iv).

[8] Garbett Decl. ¶¶ 11, 18.

gathering firms, she ultimately received two separate proposals from I&RCMS and Zero Week.[9]
Each promised it could independently gather 35,000 signatures before the deadline.[10] Confident
she could comfortably meet the 28,000-signature threshold, Garbett pressed forward with her
gubernatorial campaign.[11]

Initially, though Garbett doubted she could get on the ballot through the Convention
Route, she left open the possibility of pursuing that path.[12] However, the Utah Republican Party
later announced that, in view of the COVID-19 pandemic, it would not hold its precinct caucuses
and that, instead of choosing new state delegates for the 2020 convention, it would use the state
delegates previously selected in 2018.[13] Additionally, the Party 2020 convention was changed
from an in-person to a virtual event.[14] Recognizing she would be unable to organize her own
supporters to become state delegates, Garbett believed securing the nomination through the
Convention Route now was nearly impossible.[15] So when she submitted her formal declaration
of candidacy, she indicated she would exclusively pursue the Signature-Gathering Route.[16]

On February 17, Garbett contracted with I&RCMS to gather 35,000 signatures by April
8.[17] She also engaged Zero Week to collect an additional 15,000 signatures in Utah County
alone, for a total of 50,000 anticipated signatures.[18] I&RCMS began its signature gathering

---

[9] *Id.* ¶¶ 17, 19–20.

[10] *Id.*

[11] *Id.* ¶ 18.

[12] *Id.* ¶ 13.

[13] Dkt. 6 at 4–5.

[14] *Id.*

[15] Garbett Decl. ¶ 14.

[16] Lee Decl. ¶ 39.  Garbett filed her declaration of candidacy on March 19, 2020.

[17] *Id.* ¶ 19.

[18] *Id.* ¶¶ 20–21.

efforts on February 24, the same day Garbett filed with the Lieutenant Governor's Office notice of her intent to gather signatures.[19]  Zero Week did not begin collecting signatures until March 11.[20]

Both firms relied principally on canvassing to collect signatures, which is considered the most cost-effective and reliable method.[21]  Canvassers use voter data to target Republican voters and then knock on their doors to request signatures.[22]  In addition to canvassing, I&RCMS sought to collect signatures through public signature gathering—*i.e.*, soliciting signatures in public locations outside of sporting events, grocery stores, and other high pedestrian traffic areas.[23]

## II.    The COVID-19 Pandemic's Impact on Garbett's Signature Gathering

As I&RCMS and Zero Week ramped up operations in early-to-mid March, public and private action to reduce transmission of COVID-19 began to disrupt their signature-gathering efforts.[24]  By March 6, fears of a looming public health crisis due to COVID-19 led Governor Herbert to declare a state of emergency in Utah (Executive Order 2020-1).[25]  Soon after on March 11, the National Basketball Association postponed its season, and the next day the Governor requested residents to limit gatherings to no more than 100 people.[26]

---

[19] *Id.* ¶¶ 23–24.

[20] *Id.* ¶ 27.

[21] *Id.* ¶¶ 24, 27; Dkt. 17, Declaration of Ted Blaszak (Blaszak Decl.) ¶ 2.

[22] Garbett Decl. ¶ 28.

[23] Blaszak Decl. ¶ 14.

[24] Garbett Decl. ¶¶ 29–42.

[25] Dkt. 6, Ex. 2 at 2.

[26] Garbett Decl. ¶ 29.

On March 16, Zero Week informed Garbett it was suspending signature gathering efforts and instructing its employees to stay at home.[27]  As a result, Garbett ended her contract with Zero Week, and I&RCMS took over operations for Utah County.[28]  By March 25, I&RCMS had hired nearly 200 people to collect signatures for Garbett.[29]

On March 27, Governor Herbert issued a statewide "Stay safe, stay home" directive (Stay Home Directive) asking people to stay home and limit social interaction.[30]  Although Garbett recognized the Stay Home Directive was not an order, she decided to end her campaign's public outreach efforts on March 28 to help limit transmission of COVID-19.[31]  In the last two weeks of signature gathering, the campaign's rejection rate, *i.e.*, the rate at which people refused to sign a petition, increased from twenty to fifty percent.[32]  I&RCMS attributed this to people's fear of contracting COVID-19.[33]  Garbett had collected approximately 19,000 signatures by the time she ended her canvassing efforts on March 28.[34]

### III.   Garbett's Requests to the State for Relief and Changes to Utah's Election Procedure

While Garbett's signature-gathering efforts were ongoing, Garbett began contacting state officials about the COVID-19 pandemic's impact on her campaign.[35]  On March 11, she delivered a letter to the Lieutenant Governor's Office requesting modifications to the signature-

---

[27] *Id.* ¶ 30.

[28] *Id.* ¶¶ 30–31.

[29] *Id.* ¶ 33.

[30] *Id.* ¶ 34.

[31] *Id.* ¶ 37.

[32] *Id.* ¶ 38.

[33] *Id.*; Blaszak Decl. ¶ 19.

[34] Garbett Decl. ¶ 42.

[35] *Id.* ¶¶ 43–48.

gathering requirements.[36]  Later that day she received a response from Justin Lee, the Director of Elections in the Office of the Lieutenant Governor, asserting that the Lieutenant Governor lacked the authority to modify signature-gathering requirements.[37]

The following day on March 12, however, Governor Herbert issued Executive Order 2020-2, suspending two provisions of Utah election law.  The Order relieved prospective candidates of the requirement to file in-person declarations of candidacy.[38]

On March 17, Garbett and three other candidates for elected office (who were also gathering signatures) met with Lee to again request that the Governor take steps to lower the signature requirement threshold.[39]  Specifically, they asked that the Governor lower the primary ballot qualification requirements to ten percent of normal levels.[40]  Lee told the candidates at the meeting that the Lieutenant Governor's Office lacked the authority to implement the changes they were requesting.[41]

Finally, on March 23, Garbett's attorneys sent a letter to Governor Herbert, Lieutenant Governor Cox, and Lee again asking for relief from signature-gathering requirements.[42]  The Solicitor General in the Utah Attorney General's Office responded to the letter on March 26, directing Garbett to Executive Order 2020-8, signed the same day, that addressed signature

---

[36] *Id.* ¶ 43.

[37] *Id.*

[38] Dkt. 6, Ex. 2 at 2; Dkt. 21, Ex. F.

[39] Garbett Decl. ¶ 46.

[40] *Id.*

[41] Lee Decl. ¶ 38.

[42] Garbett Decl. ¶ 47.

gathering.[43]  Executive Order 2020-8 allowed voters to sign a petition supporting a candidate without requiring a witness to verify the signature.[44]

## IV.    Garbett's Final Efforts to Collect Signatures

In response to Executive Order 2020-8, Garbett's campaign attempted remote signature gathering, but it was much more costly and far less effective than in-person canvassing.[45]  Of the 20,000 hand-addressed letters the campaign sent to registered Republican voters, which included a nominating petition, a postage-paid return envelope, instructions, and a brief campaign message, Garbett's campaign received only 1,104 signatures—a success rate of about 5.5 percent.[46]

In total, Garbett collected 20,874 signatures by the April 13 deadline.[47]  Her volunteers tried to deliver the signatures to the Office of the Lieutenant Governor, but the Office refused to accept them.[48]

## V.    Procedural History

Garbett initiated this action for declaratory and injunctive relief on April 13, 2020, the same day the Lieutenant Governor's Office rejected her signatures.[49]  The following day, she filed the present Motion for Preliminary Injunction.[50]  On April 16, 2020, the parties filed a

---

[43] *Id.* ¶ 48; Dkt. 21, Exs. J, L.

[44] Garbett Decl. ¶ 48; Dkt. 6, Ex. 2 at 1; Dkt. 21, Ex. J.  Although this Order allowed candidates to solicit signatures electronically, it still required handwritten signatures.  That is, a candidate could email a signature packet to a registered voter, but the voter was still required to print the form, sign it, scan the signed document, and email the form back to the campaign.

[45] *Id.* ¶¶ 49–52.

[46] *Id.* ¶ 51.

[47] *Id.* ¶ 56.

[48] *Id.*

[49] Dkt. 2.

[50] Dkt. 6.

stipulated motion to expedite the briefing and hearing schedule, and requested that the court

issue a decision before Wednesday, April 29, 2020, the day state law requires the Lieutenant

Governor to certify the names to appear on the primary ballots.[51]  On April 27, 2020, the court

held a hearing on Garbett's Motion.  There, the court preliminary ruled and advised the parties

this written order would follow.

## LEGAL STANDARD

To obtain a preliminary injunction, the requesting party must demonstrate four well-

established factors: "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm

unless the injunction is issued; (3) that the threatened injury outweighs the harm that the

preliminary injunction may cause the opposing party; and (4) that the injunction, if issued, will

not adversely affect the public interest."[52]  A preliminary injunction is an extraordinary

remedy—"the exception rather than the rule."[53]  Thus, an injunction may issue only if the right to

relief is "clear and unequivocal."[54]

Further, movants face a heavier burden when seeking a "disfavored" injunction.

Injunctions are disfavored if they (1) mandate action (rather than prohibiting it), (2) change the

status quo, or (3) grant all the relief the moving party could expect from a trial win.[55]  Under this

heightened standard, "the moving party faces a heavier burden on the likelihood-of-success-on-

---

[51] Dkt. 15.

[52] *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

[53] *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989) (citation omitted).

[54] *Diné*, 839 F.3d at 1281.

[55] *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019).

the-merits and the balance-of-harms factors: She must make a 'strong showing' that these tilt in her favor."[56]

The heightened disfavored-injunction standard applies here because Garbett's requested relief falls squarely within the first category.  Garbett asks the court to take one of two actions: (1) direct Lieutenant Governor Cox to place Garbett on the Republican Party primary ballot— and by extension enjoin enforcement of Utah's requirement that Garbett submit 28,000 signatures before being placed on the ballot, or (2) require the State to postpone the printing and mailing of ballots and extend the deadline to complete signature gathering until after State and local governments lift their stay-at-home orders.  If the court granted either of Garbett's proposed remedies, it would mandate that the State take action the State previously deemed unwarranted.  Garbett can obtain her injunction, then, only if she makes a strong showing she is entitled to injunctive relief.

## ANALYSIS

Garbett bases her motion for injunctive relief on First Amendment and Equal Protection grounds.  The court considers each claim in turn.  After concluding Garbett has met her burden for injunctive relief on her First Amendment claim, the court discusses the appropriate relief warranted under the circumstances.

### I.    The Scope of Garbett's Claims

Before turning to the merits, the court notes the limited scope of Garbett's challenge to Utah's election code.  A litigant may challenge the constitutionality of a statute by asserting a facial challenge, an as-applied challenge, or both.[57]  While a facial challenge asserts that the

---

[56] *Id.* (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)).

[57] *See, e.g.*, *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008) (determining Plaintiff brought both a facial and as-applied challenge to statute's constitutionality).

challenged statute violates the Constitution in all (or nearly all) its applications, "an as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so *under the particular circumstances* of the case."[58]

Garbett's challenge is of the as-applied variety.  She maintains that Utah's election code is constitutional in most of its applications but that certain provisions have been rendered unconstitutional as applied to her only because of the COVID-19 pandemic and the State's ensuing response.  Under these extraordinary circumstances, Garbett argues certain provisions of Utah's election laws severely burden her First Amendment right of association and her Fourteenth Amendment right to equal protection.  With that in mind, the court turns to Garbett's First Amendment claim.

## II.     Garbett Has Made a Strong Showing She Is Likely to Succeed on Her First Amendment Claim

As applied during this election cycle, Garbett argues certain provisions of Utah's election law violate her freedom of association under the First Amendment by severely burdening her access to the ballot.  Ballot access laws like those Garbett challenges here "place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively."[59]  "Both of these rights, of course, rank among our most precious freedoms."[60]  In considering ballot access issues, the Supreme Court has recognized that "the rights of voters and the rights of candidates do not lend themselves to neat

---

[58] *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011) (emphasis altered) (internal citation and quotation marks omitted).

[59] *Williams v. Rhodes*, 393 U.S. 23, 30 (1968).

[60] *Id.*

separation; laws that affect candidates always have at least some theoretical, correlative effect on voters."[61]

The State does not dispute that ballot access restrictions may rise to the level of a constitutional violation.  Rather, the State maintains its election laws have not unconstitutionally burdened Garbett's access to the ballot despite the current pandemic.

In what has become known as the *Anderson-Burdick* balancing test, the Supreme Court has established a framework to assess whether election regulations unconstitutionally burden an individual's First Amendment rights.[62]  First, the court must consider "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate."[63]  Second, the court must weigh any burdens it identifies against "the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights."[64]

If, at the first step, the court determines the regulation imposes a "severe burden" on Garbett's associational rights, then strict scrutiny applies, and the law will be upheld only if it is "narrowly tailored to serve a compelling state interest."[65]  However, "when regulations impose

---

[61] *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983) (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)).

[62] *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018).

[63] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).

[64] *Id.*

[65] *Cox*, 892 F.3d at 1077 (quoting *Clingman v. Beaver*, 544 U.S. 581, 586 (2005)).  In *Cox*, the Tenth Circuit never uses explicitly the phrase "strict scrutiny."  However, the standard the Tenth Circuit describes is synonymous with the Supreme Court's strict scrutiny standard of review.  *See, e.g.*, *Burdick*, 504 U.S. at 433 (explaining that strict scrutiny requires that regulations be "narrowly tailored to advance a compelling state interest").

lesser burdens, 'a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.'"[66]

A.  As Applied This Election Cycle, Utah's Ballot Access Framework Imposes a Severe Burden on Garbett

Garbett argues that, while Utah's ballot access restrictions normally do not impose on primary candidate hopefuls an unconstitutional burden, they do under the present circumstances.[67]  She maintains that the COVID-19 pandemic "dramatically altered the landscape and radically increased the burden that Utah's ballot access laws imposed on [her]."[68] Specifically, Garbett contends the pandemic and the State's emergency orders in response made it virtually impossible to gather signatures in person, which is the most effective method to meet the signature requirement.[69]  By mid-March, most large public events had been either postponed or canceled.  Governor Herbert advised against gatherings of more than ten people and instructed people to stay six feet away from each other.  Matters escalated further on March 26 when the Governor issued the Stay Home Directive, advising people not to leave their homes.

Under the weight of these State orders and directives, Garbett argues she could not collect signatures "the way the statutory framework as drafted imagined she could."[70]  She could not, for instance, host house parties or hold campaign events.  She could not solicit signatures outside of Utah Jazz basketball games or on campuses of the state universities.  Nor could she collect signatures in person in Utah's largest city due to local shelter-in-place orders issued with the Governor's approval.

---

[66] *See Cox*, 892 F.3d at 1077 (quoting *Clingman*, 544 U.S. at 586–87).

[67] Dkt. 6 at 9.

[68] *Id.*

[69] *Id.*

[70] *Id.*

Although Garbett considered continuing her canvassing efforts despite the Stay Home Directive, she ultimately decided against it, concluding voters would be understandably reticent to sign a petition in the midst of a pandemic using "a pen and clipboard that have been touched by dozens of other people."[71]  Indeed, by the end of March, her campaign's rejection rate had ballooned from twenty percent to fifty percent.  Garbett submitted testimony from the head of a professional signature-gathering firm that the heighted rejection rate was driven by fears of COVID-19.[72]  Considering all these unforeseen limitations unique to this election cycle, Garbett argues the statutory signature requirement placed a severe burden on her First Amendment associational rights.

The State advances two arguments in response.  First, the State asserts there was no severe burden on Garbett because she enjoyed an alternative, constitutional path to the primary ballot—the Convention Route.[73]  Second, the State insists that, even if the Signature-Gathering Route was Garbett's only option, Utah's election laws still did not severely burden her.[74]  The court considers these arguments in turn.

        *1.   The availability of an alternative, constitutional route to access the ballot does not necessarily preclude finding that a candidate's rights have been severely burdened*

The core of the State's first argument is straightforward.  The State contends that, even if the COVID-19 pandemic and the State's response created additional burdens for Garbett to gather signatures, those burdens were not "severe" because "an alternate, constitutional path to

---

[71] *Id.* at 10.

[72] Blaszak Decl. ¶ 19.

[73] Dkt. 21 at 16.

[74] *Id.* at 20.

the primary ballot was available."[75]  That is, the State argues the court need not concern itself

with whether the State's actions burdened Garbett's signature-gathering efforts because Garbett

could still pursue the ballot through the Convention Route.

The State relies heavily on *Utah Republican Party v. Cox* to advance its argument.[76]  In

*Cox*, the Utah Republican Party challenged the constitutionality of SB54, a relatively new

election law enacted in 2014 that requires political parties to allow candidates to qualify for the

primary ballot by gathering signatures.[77]  Prior to the passage of SB54, the Utah Republican

Party selected its primary candidates exclusively through its Party convention, and it opposed the

creation of this additional, alternative route.[78]  The Utah Republican Party challenged the law in

part by arguing the number of signatures State House and State Senate candidates were required

to gather—1,000 and 2,000, respectively—was unconstitutionally burdensome.[79]

The Court of Appeals disagreed.  In reaching its conclusion, the Tenth Circuit considered

the Second Circuit's decision concerning an analogous issue in *LaRouche v. Kezer*.[80]  In

*LaRouche*, the Second Circuit assessed the constitutionality of two ballot access laws.  One of

the laws provided for a signature-gathering route, and the other allowed access if a candidate was

"generally and seriously recognized according to reports in the national or state news media."[81]

---

[75] *Id.* at 17.

[76] Like the Tenth Circuit in *Cox*, this court assumes for purposes of resolving Garbett's Motion that the Convention Route is a constitutional method of ballot access.  The *Cox* court was not called on to assess the Convention Route's constitutionality.  *See Cox*, 892 F.3d at 1088 ("No party to this lawsuit challenges the constitutionality of [the Convention Route] provision . . . .  Therefore, we accept that there is at least one constitutional method of ballot access under the Utah election code.").

[77] *Id.* at 1072.

[78] *Id.*

[79] *Id.* at 1086–87.

[80] 990 F.2d 36 (2d Cir. 1993).

[81] *Id.* at 37.

After concluding the signature-gathering route was constitutional standing alone, the court held the media recognition route could not pose an unconstitutional burden.[82]  That was because "the media recognition test, whether or not vague, increases the opportunities to get on the ballot and reduces the burdens on candidates."[83]  In other words, the media recognition route, though nebulous, could not be considered burdensome to candidates because it simply provided another avenue to access the ballot in addition to the constitutionally valid signature route.

Similarly, the Tenth Circuit in *Cox* held that SB54's signature-gathering option could not be an unconstitutional burden because it provided a second opportunity to get on the ballot in addition to the traditional convention route.[84]  Before SB54's passage, primary hopefuls had one chance to get on the ballot: through the Utah Republican Party's nominating convention.  SB54 gave candidates an additional route through signature-gathering.  The Court of Appeals observed that, even if that alternative route would be daunting for some candidates, *i.e.*, for those in districts where the practical effect of the law would require them to obtain over fifty percent of Republican voters' signatures, it could not in any way diminish a candidate's chances of getting on the ballot.  In that way, the signature-gathering provision could not be considered an unconstitutional burden.[85]

The State argues *Cox* forecloses Garbett's argument that Utah's ballot access framework as applied this year severely burdens her because she still had the option to pursue the Convention Route.  The court does not share the State's reading of *Cox*.  The question before the

---

[82] *Id.* at 38.

[83] *Id.*

[84] 892 F.3d at 1089–91.

[85] *See id.* at 1090 ("Therefore, from the [Utah Republican Party's] perspective, the signature-gathering provision only increases the opportunities to get on the ballot thereby reducing the burden.") (internal quotation marks and citation omitted).

Tenth Circuit in *Cox* was materially different than the one before this court. *Cox* considered whether adding an alternative route to accessing the primary ballot—albeit a route that, in practice, could be extremely difficult for some candidates to utilize—presented an unconstitutional burden to the Utah Republican Party's First Amendment right of association. Since it could only help candidates' chances, the Tenth Circuit concluded it did not present a severe burden. Here, in contrast, the question is whether unforeseen, extraordinary circumstances and State action that place additional burdens on candidates pursuing the Signature-Gathering Route beyond what the statutory scheme envisioned can rise to the level of an unconstitutionally severe burden. Whereas the legislative addition of the Signature-Gathering Route that *Cox* considered could only *increase* candidates' odds of accessing the ballot, Garbett faced executive action and circumstances that *decreased* her odds of accessing the ballot.

Citing *Cox*, the State implies no set of circumstances nor any amount of State interference could rise to the level of a severe burden on candidates pursuing signature-gathering so long as the Convention Route remains open to them.[86] In the State's view, the Signature-Gathering Route was always extra anyway, so it does not matter if the State effectively blocks that avenue.

But the State's argument sweeps too broadly and is irreconcilable with language in the *Cox* decision. As an initial matter, whatever *Cox*'s reach, the Tenth Circuit made clear it was not deciding how it would treat challenges to the signature-gathering requirement brought by individual candidates: "Our analysis here is confined to the question of whether the Signature Requirement constitutes an unconstitutional burden on the [Utah Republican Party]. Because the

---

[86] Dkt. 21 at 18 ("The signature-gathering provision only *increases* the opportunities to get on the ballot, even with Covid-19 Executive Orders.").

litigants are political parties and not candidates, we do not address the burdens imposed on individual candidates."[87]

Beyond that, the Court of Appeals provided further guidance explaining how courts should evaluate burdens on candidates where multiple paths to the ballot are available:

> The lesson we take from *LaRouche*, then, is that when conducting *Anderson–Burdick* balancing with regards to state ballot-access laws, due weight should be accorded to whether a challenged provision stands in isolation as the sole method for accessing the ballot, or whether candidates have alternative and constitutionally sufficient paths through which to qualify. In the latter circumstance, the burden that any one particular route to ballot access that the law places on candidates, voters, and parties is necessarily reduced.[88]

If *Cox* stood for the bright line rule the State advances, there would be no need for courts to accord "due weight" to whether a challenged provision stands in isolation or whether alternative paths exist. Rather, no inquiry at all would be required so long as an alternative was available. Further, *Cox* is explicit that the existence of an alternative route "necessarily reduce[s]"—not eliminates—the burden that any one particular route to ballot access places on candidates.

One can conceive numerous hypotheticals that illustrate additional reasons to be skeptical of the State's position. By way of example, consider first a Republican candidate for governor in a future election who forgoes the Signature-Gathering Route in favor of the Convention Route. Suppose a second candidate for the office, strongly preferred by the sitting governor, opts exclusively for the Signature-Gathering Route. Four weeks before the statutory deadline to submit signatures (and roughly ten weeks into the signature-gathering period), the governor's preferred candidate submits well in excess of the required 28,000 valid signatures and qualifies for the primary ballot. If the governor then took official action preventing the Republican Party

---

[87] 892 F.3d at 1089 n.22.

[88] *Id.* at 1088.

from holding its convention—thus leaving the first candidate with only four weeks remaining to gather 28,000 signatures—the State's argument in this case would leave the first candidate, relying exclusively on the Convention Route, with no First Amendment challenge under *Cox*.

While the Party or the candidate may have other available claims, the State's argument concerning the availability of an alternative (presumptively constitutional) Signature-Gathering Route would foreclose any First Amendment challenge under *Cox*. This would be so notwithstanding that it was executive action that removed the availability of the second alternative Convention Route. Nor would it matter that the Signature-Gathering Route became more challenging because the affected candidate was left with only four weeks, as opposed to roughly fourteen weeks, to gather signatures.

*Cox* does not demand this outcome. It seems unlikely that executive State action imposing additional burdens on candidates pursuing either available route created by the legislature can *never* rise to the level of a severe burden merely because the other avenue was theoretically available at one time. The Tenth Circuit seems to have said as much in *Cox* when it recognized that a ballot qualification statute that was "wholly irrational" could be unconstitutional even where another constitutionally valid route was available.[89] In other words, the Tenth Circuit left open the possibility there could be scenarios in which a ballot qualification regulation could be unconstitutional notwithstanding an additional constitutional alternative was available.

For these reasons, the court does not read *Cox* to foreclose Garbett's argument that the State's actions impinging her ability to collect signatures could rise to the level of a severe burden when considered under the totality of the circumstances.

---

[89] 892 F.3d at 1088.

Notwithstanding that conclusion, the availability of the Convention Route is clearly relevant under *Cox*. Both Supreme Court and Tenth Circuit precedent instruct the court "to analyze ballot-access opportunities in sum rather than in isolation."[90] Indeed, "due consideration is [to be] given to the practical effect of the election laws of a given state, viewed in their totality."[91] In contrast, the State's argument that Garbett could have pursued the Convention Route largely ignores the practical effect of the election laws unique to this election cycle. In a normal cycle, the Utah Republican Party holds precinct caucuses at which delegates to the state nominating convention are selected.[92] These precinct caucuses are important to candidates in at least two ways. First, they allow a candidate's supporters to speak with other Republican voters (some of whom would become delegates) about a candidate's positions and to try to generate momentum.[93] More importantly, candidates can use the precinct caucuses to organize their own supporters to become delegates. In mid-March, however, the Utah Republican Party canceled the precinct caucuses and announced that, instead of selecting new delegates for the 2020 convention, it would use the same delegates previously selected in 2018. This decision prejudiced Garbett's ability to succeed through the Convention Route, and it was only after the announcement to use 2018 delegates that Garbett formally chose to rely exclusively on the Signature-Gathering Route.

At bottom, when balancing the respective burdens associated with ballot access laws, *Cox* instructs that the availability of alternative and constitutionally sufficient avenues to the ballot

---

[90] *Cox*, 892 F.3d at 1088 (citing *Burdick*, 504 U.S. at 438–39).

[91] *Id.* (quoting *Arutunoff v. Okla. State Election Bd.*, 687 F.2d 1375, 1379 (1982)).

[92] Garbett Decl. ¶ 13.

[93] *Id.*

necessarily reduces the burden one particular route may place on a candidate.[94]  And surely that

is the case here for the reasons the State argues.  But as explained above, this court understands

*Cox* to require consideration and balancing of all the circumstances presented—including factors

that impact the availability or efficacy of the alternate routes available.  Here, the COVID-19

pandemic forced the Utah Republican Party to alter its convention procedures in ways that

prejudiced Garbett's opportunity to proceed through the Convention Route.  So, while available

to her, the Convention Route provided less opportunity for ballot access than it would have free

of the impacts of the COVID-19 pandemic.

Having concluded that the availability to Garbett of the Convention Route does not

necessarily mean her associational rights were not severely burdened, the court turns to the

State's alternative argument concerning the relative burden on Garbett's signature-gathering

efforts.

### 2.  *Taken together, Utah's signature requirement and the State's emergency orders imposed a severe burden on Garbett's First Amendment Rights*

Putting the availability of the Convention Route aside, the State argues its ballot access

framework and emergency measures did not severely burden Garbett.  The State points to

measures it took to reduce the burden on candidates as well as other candidates' success

collecting the requisite signatures.[95]  The State's arguments are unavailing.

Before addressing the merits of the State's arguments, it is important to clarify a point

about the emergency orders issued in response to the COVID-19 pandemic.  The outbreak of the

virus nationally and in Utah remains a public health crisis without modern equivalent.  There are

---

[94] *See* 892 F.3d at 1088.

[95] Dkt. 21 at 20.

now over 1,000,000 confirmed cases in the United States, resulting in over 55,000 deaths.  In

Utah alone, more than 4,300 people have tested positive, resulting in 370 hospitalizations and at

least 45 deaths.  Roughly five months after it became clear the virus was likely to spread

throughout the United States, the situation remains dynamic.  Much is still unknown about the

nature of the virus, its transmission, its varying effects on people, possible treatment protocols,

and other essential matters.  The uncertainty surrounding all of this was profoundly greater in

March, when executives at all levels of state and local governments intervened to protect the

Utahns.  Governor Herbert and mayors throughout the State took unprecedented action in

response to this unprecedented threat.  The court does not question the good faith of our elected

leaders in addressing this evolving health care crisis.  Rather, this case presents questions related

only to the impact of some of those measures on election-related activities in the State.

Concerning Garbett's claims here, the State contests Garbett's assertion that it refused to

make changes to the statutes and rules governing ballot access to accommodate candidates

during the pandemic.[96]  Specifically, the State emphasizes that Governor Herbert issued

Executive Order 2020-8, suspending the requirement that each signature be witnessed by a

petition circulator.[97]  This enabled candidates to collect hand-written signatures through

electronic means.  Garbett counters that the measure did little to reduce the burden her campaign

faced because of how much more costly—and less effective—remote signature gathering is.

Indeed, her attempt to pursue remote signature gathering was expensive yet largely fruitless.

As evidence that Executive Order 2020-8 was successful in reducing candidates' burdens,

the State stresses "three other gubernatorial candidates succeeded in gathering signatures."[98]

---

[96] *Id.*

[97] *Id.*

[98] *Id.*

Those candidates were Lieutenant Governor Cox, Thomas Wright, and Jon Huntsman.  This, the State argues, shows Garbett was not severely burdened.  Further, the State cites language from *Cox* that evidence that some candidates succeed in meeting signature requirements "weighs in favor of finding that the burden is less than severe."[99]

The State's reliance on that portion of *Cox* ignores the context of that litigation.  There, the Utah Republican Party brought a facial challenge to SB54, arguing that a requirement to satisfy a particular signature threshold alone was enough to render SB54 unconstitutional.  In other words, whatever weight the *Cox* court gave to evidence that some candidates had met signature requirements, it was in the context of candidates' ability to reach the threshold under normal circumstances.  It does not appear the case called for the Court of Appeals to consider the separate question concerning how the burden analysis would be impacted if candidates were subjected to additional, unanticipated hurdles above and beyond what the statutory framework contemplated.  Here, the burden Garbett alleges is severe is not the requirement to gather 28,000 signatures—it is the burden of having to gather 28,000 signatures in the midst of a pandemic when large public events have been canceled and the Governor has directed people to stay six feet apart and, preferably, to stay home.

Accordingly, the court affords little weight to evidence that Thomas Wright and Lieutenant Governor Cox met the signature requirement.  Those two candidates submitted sufficient qualifying signatures by March 3 and March 16, respectively, well before the COVID-19 crisis escalated and before significant disruptions to everyday life occurred.[100]  Because those candidates' collection efforts were largely unaffected by disruptions the COVID-19 pandemic

---

[99] 892 F.3d at 1090.

[100] Lee Decl. ¶¶ 15, 21–24.

caused—and before the Governor issued the State's Stay Home Directive—they do not provide a helpful measure of the severity of the burden on other signature-gathering candidates.[101]

That leaves Jon Huntsman, who met the requisite threshold in part by collecting roughly 19,000 signatures after the Stay Home Directive was announced.[102]  Applying *Cox*, the court agrees this is evidence that weighs in favor of finding the burden on ballot access was less severe.  But the court understands *Cox* to require balancing all the relevant evidence in its totality.  And neither party has proffered any facts detailing how Huntsman and his campaign were able to acquire the 19,000 signatures.

In contrast, Garbett has presented evidence that the per signature cost of collecting signatures remotely is exponentially higher than collecting them in person, despite being much less effective.[103]  Thus, it could be that Huntsman was able to secure the 19,000 signatures only by expending significant amounts of money.  His unique status as former Governor of Utah, former Ambassador to Russia, China, and Singapore, and member of five Presidential administrations also distinguishes him for other signature gatherers.  In any case, the evidence suggests that requiring candidates to collect signatures remotely dramatically increased the cost of collecting signatures—prohibitively so for Garbett.

---

[101] The State implies Garbett should have started collecting signatures earlier.  Dkt. 21 at 29 (noting "Garbett . . . wait[ed] almost two full months after January 1 before beginning to gather signatures.").  But candidates should not be penalized where they "had planned to ramp up signature collection efforts in March and April, when warmer spring weather would accommodate outdoor activities and be more conducive to large social gatherings and door-to-door canvassing."  *Esshaki v. Whitmer*, No. 2:20-cv-10831-TGB, 2020 WL 1910154, at *4 (E.D. Mich. Apr. 20, 2020); *cf Jones v. McGuffage*, 921 F. Supp. 2d 888, 897 (N.D. Ill. 2013) (declining to fault candidates who were unsuccessful collecting enough signatures during Chicago's winter months to qualify for a special election ballot when there was "a dearth of large scale, outdoor, public events during which signature drives are most successful").

[102] *See* Lee Decl. ¶ 45.

[103] Garbett Decl. ¶¶ 51–53; *see also* Daniel Hays Lowenstein & Robert M. Stern, *The First Amendment and Paid Initiative Petition Circulators: A Dissenting View and A Proposal*, 17 Hastings Const. L.Q. 175, 206 (1989) ("Recipients are not likely to sign and return the petitions. . . . Whereas the course of least resistance in a shopping mall may be to sign when asked, signing and returning a petition by mail takes significantly more effort than throwing away the solicitation letter.").

In considering this very issue, another district court recently concluded, "the financial burden imposed by an unforeseen but suddenly required mail-only signature campaign is far more than an incidental campaign expense or reasonable regulatory requirement.  For any candidate other than those with unusually robust financial means, such a last-minute requirement could be prohibitive."[104]  For these reasons, while Huntsman's success in meeting the signature requirement is relevant, that one well-heeled candidate just cleared the threshold signature requirement at the eleventh hour does not persuade the court Garbett has failed to demonstrate a severe burden.

In the end, "there is no hard-and-fast rule as to when a restriction on ballot eligibility becomes an unconstitutional burden."[105]  Rather, the court must consider the "character and magnitude" of the injury in view of the statutory framework as a whole, the practical effect of the election laws, and the available avenues to the ballot.[106]  And because Garbett brings an as-applied challenge, the court must consider her injury under the unique circumstances related to the COVID-19 pandemic.

On balance, considering the current pandemic and the totality of the State's emergency measures to combat it, Utah's ballot access framework as applied this year imposed a severe burden on Garbett's Frist Amendment rights.  In light of nearly all public events being canceled, orders for people to stay six feet apart and to stay home, and the extraordinary impact on nearly all aspects of everyday life, it is difficult to imagine a confluence of events that would make it more difficult for a candidate to collect signatures.  Although the State plainly acted in good faith by making remote signature gathering possible, the State's measures were insufficient to relieve

---

[104] *Esshaki*, 2020 WL 1910154, at *5.

[105] *Cox*, 892 F.3d at 1086 (citation omitted).

[106] *Id.* at 1077, 1088.

the severe burden candidate Garbett confronted.  Moreover, in response to the COVID-19

pandemic, the Utah Republican Party decided to use state delegates from 2018 rather than select

new delegates.  Although not dispositive, this change prejudiced Garbett by depriving her of the

opportunity to organize her supporters as state delegates, rendering the Convention Route

meaningfully more difficult.  In short, under these specific circumstances, the character and

magnitude of the burden on Garbett's First Amendment rights was severe.

> B.  The State's Ballot Access Framework Was Not Narrowly Tailored to Serve Its Compelling State Interests

Having concluded that the State's ballot access framework as applied this election cycle

imposes a severe burden on Garbett's First Amendment rights, the court must next consider

whether that framework is "narrowly tailored to serve a compelling state interest."[107]

The State argues the ballot access framework this year serves three compelling interests:

(1) the health and safety of citizens; (2) reasonable ballot access for candidates; and (3) fair and

orderly elections.[108]  The Supreme Court has recognized these objectives as compelling

interests.[109]  Much of the State's argument focuses on the second and third interests of reasonable

ballot access and conducting fair and orderly elections.  Specifically, the State emphasizes that

Garbett's proposed relief threatens its interest in ensuring a candidate garners a "modicum of

support" before being placed on the primary ballot.[110]  Garbett does not dispute that these

---

[107] *Id.* at 1077 (quoting *Clingman*, 544 U.S. at 586).

[108] Dkt. 21 at 23.

[109] *See, e.g.*, *Nat. Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 677 (1989) (noting the government has a compelling interest in the safety of its citizens); *Purcell v. Gonzales*, 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process.") (internal quotation marks and citation omitted); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.").

[110] *See Jenness v. Fortson*, 403 U.S. 431, 442 (1971) ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election.").

interests are compelling.  Instead, she argues the State's election laws—when overlaid with the State's emergency orders—are not narrowly tailored to achieve those interests.

Before taking up this issue, it is important to clarify what regulations Garbett argues must be narrowly tailored to serve the State's compelling interests.  She does not challenge the State's emergency responses themselves.  Rather, Garbett argues the election code provision requiring candidates to collect 28,000 signatures to access the primary ballot, *coupled with the State's emergency orders*, created a ballot access framework that is not narrowly tailored to achieve the State's interest in ensuring candidates have a sufficient modicum of support before being placed on a primary ballot.  That is, the Governor's Stay Home Directive, along with Executive Orders 2020-1, 2020-2, and 2020-8, all impacted the relative burden of the 28,000-signature requirement for this year's primary races as compared to a normal election cycle.  Thus, the court must decide whether, taken together, the ballot access framework as applied this year was narrowly tailored to achieve the State's compelling interests.  The court concludes it was not.

While Garbett suggests multiple ways the Governor could have narrowly tailored the ballot access framework in view of the COVID-19 crisis, the parties largely focus on whether the Governor should have—or could have—reduced the number of signatures candidates were required to collect.  The State argues the Governor lacks the authority to do so.  Where, as here, the Governor has declared a state of emergency, Utah Code § 53-2A-209(4)(a) supplies the authority to suspend enforcement of a statute if doing so is "necessary to address the state of emergency."  But while the Governor may *suspend* a statute, the State argues he may not *modify* laws or write new ones.[111]  Thus, when considering Garbett's March request that the Governor reduce the signature requirement, the State maintains the Governor was empowered to do only

---

[111] Dkt. 21 at 24.  The State cites no legal authority for this proposition.

one of two things: keep the requirement at 28,000 or suspend the requirement entirely.  And taking the latter, drastic step "would undermine the State's obligation to ensure fair and orderly elections" because many candidates would advance to the primary ballot without having demonstrated a significant modicum of support.[112]

The State's argument is unconvincing.  The distinction the State attempts to draw between the Governor's authority to suspend a law but not to modify it is not clearly supported. If, for instance, the Governor suspended enforcement of the law forbidding electronic signatures for election petitions, he would be modifying the election code.[113]  The State seems to be arguing that the Governor does not have the authority to replace specific words in a statute or add new language, which precludes him from replacing the 28,000 number with a different figure.

At the outset, the State's reasoning fails to account for the generally accepted maxim that where a party can exercise a greater power, it may necessarily exercise lesser powers.[114]  The State acknowledges the Governor has the greater power to reduce the signature requirement to zero but simultaneously argues he does not have the lesser power to reduce the requirement to, say, 24,000 signatures.  The court is skeptical.

More to the point, the Governor's authority under Utah Code § 53-2a-204(1)(b) and his application of that authority to election law in issuing Executive Order 2020-2 undermines the State's argument.  Executive Order 2020-2 explicitly states the Governor has authority under Utah Code § 53-2a-204(1)(b) "to employ measures and give direction to state and local officers

---

[112] *Id.*

[113] *Modify*, Merriam-Webster Online Dictionary (available at https://www.merriam-webster.com/dictionary/modify) (last visited April 27, 2020) ("to make less extreme"; "to make minor changes in"; "to make basic or fundamental changes in often to give a new orientation to or to serve a new end").

[114] *See, e.g.*, *44 Liquormart, Inc. v. R. I.*, 517 U.S. 484, 511 (1996) (acknowledging "the proposition that greater powers include lesser ones" but declining to apply the syllogism in the context of commercial speech); *cf. Patchak v. Zinke*, 138 S.Ct. 897, 906 (2018) ("Congress' greater power to create lower federal courts includes its lesser power to limit the jurisdiction of those Courts.") (internal quotation marks and citations omitted).

and agencies that are reasonable and necessary to secure compliance with orders made pursuant to part 2 of the Emergency Management Act."[115]  Thus, when the Governor suspends a statute, state law also empowers him to take subsequent action that may be necessary in the wake of that suspension.  For example, as noted, through Executive Order 2020-2 the Governor suspended the requirement that candidates file a declaration of candidacy in person.  Absent further action by the Governor, that Order would have eliminated entirely the requirement to file a declaration of candidacy.  Apparently not wanting to relieve candidates of that requirement altogether—and in the same Order suspending the relevant statute—the Governor further "direct[ed] the Director of Elections to permit a potential candidate to file a declaration of candidacy as though the potential candidate is an individual qualified to use the procedures provided in Utah Code § 20A-9-202(1)(c)."[116]  The effect of the Governor's Order was to allow candidates to file their declaration of candidacies electronically, thereby reducing in-person contact and protecting against the transmission of COVID-19.  Similarly, had the Governor chosen to suspend the 28,000-signature requirement, the State has not explained why, under Utah Code § 53-2a-204(1)(b), the Governor could not have simultaneously directed the Director of Elections to accept some lower number.  Although the court expresses no view whether or when the Governor *should* have lowered the signature requirement (or what revised number was appropriate under the circumstances), it appears under the statutory framework the Governor *could* have revised the threshold.  This forecloses the State's argument it could not have crafted a narrower response in addressing the COVID-19 pandemic to account for its important elections-related interest.

---

[115] Dkt. 21, Ex. F.

[116] *Id.*

29

Because more narrow means were available to the State, the court concludes the State did not sufficiently tailor its ballot access framework to achieve its election related interests. Specifically, the reasonable and good-faith measures the State took to protect its compelling interest in ensuring the health and safety of its citizens did not adequately account for the dramatic burden those measures placed on signature-gathering efforts under the State's election code.  To be clear, the court agrees the State has a compelling interest in ensuring candidates have a modicum of support before advancing to a primary ballot.  But the State's response fails to account for the reality that the legislature's determination when enacting SB54 that 28,000 signatures was sufficient to demonstrate a modicum of support under normal circumstances.  The COVID-19 crisis and the State's emergency response significantly depressed candidates' ability to demonstrate a modicum of support and voters' ability to express their support.  Garbett was deprived of a significant period of time for the two most effective ways of collecting signatures—canvassing door-to-door and approaching people at large public events.  If 28,000 signatures is sufficient to show a modicum of support under normal circumstances, surely some lower number would reflect a comparable level of support during an election cycle when public gatherings have been shut down, citizens have been told to stay six feet apart from one another, and the Governor has further directed people to stay home.

Other district courts considering this question in the wake of the COVID-19 pandemic reach the same conclusion:

> [E]ven assuming the State has a compelling interest in the need to ensure a
> modicum of support through the enforcement of the signature requirement, the
> regulatory means to accomplish that compelling interest are not narrowly tailored
> to the context of the COVID-19 pandemic . . . . This is because under typical
> conditions, Plaintiff's ability to obtain one thousand signatures from registered
> voters would be a valid indication that he has earned the "modicum of support"
> the Michigan Legislature deemed sufficient to appear on the ballot. When setting
> the requirement at one thousand signatures, the Michigan Legislature intended
> that candidates be allowed until April 21, 2020—under normal, non-pandemic
> conditions—to gather one thousand signatures using all of the traditionally
> effective means to do so. The March 23, 2020 Stay-at-Home Order, for reasons
> already discussed, effectively halted signature-gathering by traditional means . . . .
> Thus, a state action narrowly tailored to accomplish the same compelling state
> interest would correspondingly reduce the signature requirement to account for
> the lost [time]. Or, to state it differently, even assuming the State generally has a
> compelling interest in ensuring candidates have a modicum of support before
> allowing inclusion on the ballot, here the State has not shown it has a compelling
> interest in enforcing *the specific numerical requirements* set forth in Section
> 168.544f in the context of the pandemic conditions and the upcoming August
> primary.[117]

Further, the State's actions must be considered in the context of the important interests

the State previously advanced to support the Signature-Gathering Route.  In prior litigation, the

State justified the Signature-Gathering Route as furthering the "important Utah interests of

managing elections in a controlled manner, increasing voter participation, and increasing access

to the ballot."[118]  But the current framework does violence to those very interests by making it

exceptionally more difficult for signature-gathering candidates to access the ballot.  Although the

State was undoubtedly justified in employing emergency measures to ensure the health and

safety of its citizens, the State failed to implement sufficient complementary measures to account

for the stifling effect its response to the COVID-19 pandemic exacted on accessing the ballot.

---

[117] *Esshaki*, 2020 WL 1910154, at *7; *see also Libertarian Party of Ill. v. Pritzker*, No. 20-cv-2112, 2020 WL 1951687, at *4 (N.D. Ill. Apr. 23, 2020) (concluding that a different standard must be applied during the COVID-19 pandemic to assess whether a candidate has demonstrated of modicum of support).

[118] *Cox*, 892 F.3d at 1084 (quoting the State's brief).

For these reasons, as applied to Garbett during this unique election cycle, the court concludes the State did not narrowly tailor its ballot access framework to achieve its compelling interests.

In sum, Garbett has shown convincingly both that the State's ballot access framework imposes a severe burden on her First Amendment associational right and that that framework was not narrowly tailored to serve a compelling interest. Thus, she has made a strong showing she is likely to succeed on the merits of her First Amendment claim.

### III.   Garbett Has Not Made a Strong Showing She Is Likely to Succeed on the Merits of Her Equal Protection Claim

Garbett asserts the ballot access framework as applied during the COVID-19 pandemic violates her Equal Protection rights in two ways: (1) it draws a line between candidates who pursue the Signature-Gathering Route on the one hand and those that pursue the Convention Route on the other, and (2) it draws a line between candidates who began gathering signatures in January and those who did not begin until February.

The State responds that neither the ballot access framework nor the COVID-19 executive orders create any classifications. In the absence of any classifications, the State contends there is no Equal Protection analysis to perform. And even if the court concluded otherwise, Garbett concedes the appropriate level of review under the Equal Protection clause is rational basis. The State asserts there can be no question its ballot access framework and actions to contain the spread of COVID-19 are rationally related to its important interests of protecting public health and ensuring fair and orderly elections.

Garbett's briefing offers no response to the State's Equal Protection arguments, choosing instead to address only the First Amendment issues. At oral argument, the court stated it appears Garbett effectively abandoned her Equal Protection claim. She did not disagree and offered no

argument related to that claim.  In view of this, and for the persuasive reasons the State offers, the court finds Garbett has not made a strong showing she is likely to succeed on the merits of her Equal Protection claim.

### IV.   The Remaining Preliminary Injunction Factors

As explained below, the court finds Garbett has met her burden on the remaining injunction factors.  In conducting this analysis, the court would ordinarily consider each factor in view of Garbett's proposed relief.  Here, however, acting in equity, the court grants relief more narrow than the remedy Garbett sought.[119]  Specifically, for reasons outlined later, the court will order the State to place Garbett on the ballot only if the State determines Garbett collected 19,040 valid signatures.  The court therefore reviews the remaining injunction factors in light of the specific relief granted.

### A.   Garbett Will Suffer Irreparable Harm Without Preliminary Relief

Garbett argues that, absent the court's issuance of a preliminary injunction, the Lieutenant Governor will print and distribute Republican primary ballots without her name, thereby violating her First Amendment rights.[120]  The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[121]  Thus, when a plaintiff alleges her First Amendment rights have been infringed, irreparable injury is generally

---

[119] "[A] court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."  *See Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)) (internal quotation marks omitted).

[120] Dkt. 6 at 22.

[121] *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

presumed.[122]  Further, the Supreme Court has confirmed the possibility that being unjustifiably

shut out from an election constitutes irreparable injury.[123]

Garbett has made a strong showing she is likely to succeed on her First Amendment

claim, entitling her to a presumption of irreparable injury.  The State does not dispute that

Garbett faces irreparable injury if she is wrongly denied injunctive relief and thus fails to rebut

the presumption of harm.  Accordingly, the court concludes Garbett will suffer irreparable injury

absent any relief.

B.  The Requested Injunction Does Not Adversely Affect the Public Interest

Granting Garbett's injunction request will not adversely affect the public interest.

Garbett argues granting her injunction serves the public interest because "it is always in the

public interest to prevent the violation of a party's constitutional rights."[124]  The State disagrees,

arguing Garbett's proposed relief will contribute to "voter confusion caused by an overcrowded

ballot" and that "court-ordered eve-of-election changes" adversely affect the public interest.[125]

The specific relief the court fashions accounts for most of these concerns.  As noted, the court

will reduce the signature threshold Garbett must meet to 19,040.  Because the Lieutenant

Governor's Office has yet to verify any of Garbett's signatures, it is uncertain whether Garbett's

name will ultimately be placed on the ballot.

---

[122] *See Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) ("We agree . . . it is proper for us to assume irreparable injury due to the deprivation of [Plaintiff's] commercial speech rights.").

[123] *See Brown v. Chote*, 411 U.S. 452, 456 (1973) (affirming district court's finding of irreparable injury where "appellee's opportunity to be a candidate would have been foreclosed, absent some relief"); *see also United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1259 (D. Utah 2017) (finding irreparable harm in denying ballot access to a political party because the election "will only be held once").

[124] *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012) (internal quotation marks and citation omitted).

[125] Dkt. 21 at 34.

Regardless of whether Garbett meets the reduced threshold, the public interest will be served. If Garbett succeeds in accessing the ballot, the public interest is served by vindicating her constitutional right and honoring the support of those voters who signer her petition while it was safe to do so.[126] Further, most of the State's proffered concerns are irrelevant given that the court is not providing all the relief Garbett seeks, and by issuing a more narrow injunction is not "[m]aking Garbett a candidate by judicial decree."[127] To the contrary, if Garbett appears on the Republican primary ballot, it will be because she demonstrated under the prevailing circumstances she has a significant modicum of support. Thus, the State's fears of voter confusion are inapplicable here because Garbett would have earned the right to appear on the ballot. The court's injunction is also limited to Garbett. No other races or candidates are implicated. As a result, there is no risk of an overcrowded ballot. Moreover, because the court issues its decision before Lieutenant Governor Cox must certify the candidates, and because the injunction extends critical deadlines, the court is not imposing a late-hour change to the election.

On the other hand, if Garbett fails to meet the reduced threshold, she will have no constitutional right to vindicate. The State has an important interest in restricting ballot access to candidates who have shown a modicum of support. The court's proposed relief takes that important interest into consideration. Accordingly, the court concludes the narrow injunction it issues advances the public interest.

---

[126] *See Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

[127] Dkt. 21 at 34.

C.  The Balance of Harms Tips in Garbett's Favor

When considering the balance of harms factor, the court must examine whether "the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction."[128]  The State offered no response to Garbett's Motion on this point.

Weighing the respective harms, the court concludes Garbett has made a strong showing the threatened injury to her First Amendment rights outweighs any potential harm the preliminary injunction may cause the State.  As discussed above, absent injunctive relief reducing the signature requirement, Garbett's First Amendment rights would be violated. Moreover, the State has articulated no harm it would suffer beyond that discussed with regard to the public interest.  And, as explained, the fashioned injunction proportionally reducing the signature requirement addresses the State's concerns.  The court concludes this factor strongly weighs in Garbett's favor.

In sum, Garbett has made a strong showing she is likely to succeed on the merits of her First Amendment claim, she will suffer irreparable injury absent relief, the balance of harms weighs in her favor, and injunctive relief will not adversely affect the public interest. Considering the unforeseen, extraordinary burdens the COVID-19 crisis and the State's response placed on Garbett's efforts to access the ballot, she is entitled to the extraordinary remedy of injunctive relief.

The court now considers the relief warranted under the circumstances.

---

[128] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003) (internal quotation marks and citation omitted).

V.      Remedy

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."[129]  In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case."[130] Such a tailored approach is necessary here.

Garbett asks the court to order Lieutenant Governor Cox to place her on the Republican primary ballot.  Alternatively, Garbett asks the court to give her more time to gather more signatures.

Neither of Garbett's proposed forms of relief appropriately balances the burden Garbett faced with the State's valid interests.  Garbett's first request for relief goes too far.  The State has an important interest in ensuring candidates demonstrate a modicum of voter support before securing a place on a ballot.  Although Garbett submitted evidence she obtained nearly 21,000 signatures, this alone is insufficient to demonstrate a threshold showing of support under the circumstances.  Indeed, the Lieutenant Governor's Office has yet to verify how many of her signatures are valid.

And Garbett's alternative request for relief is impractical.  Neither Garbett nor the State can predict when Utah's individual counties will lift their respective stay-at-home orders.  The court declines to tie any form of relief to the lifting of those stay-at-home orders.  In any event, the relief the court grants sufficiently accounts for the time Garbett lost to gather signatures.

---

[129] *Int'l Refugee Assistance Project*, 137 S.Ct. at 2087 (citations omitted).

[130] *Id.* (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2947 (3d ed. 2013)) (internal quotation marks omitted); *see also Diné*, 839 F.3d at 1286 ("In exercising equitable discretion over motions for temporary relief, courts cannot woodenly employ a one size fits all mindset.  Equity eschews mechanical rules; it depends on flexibility.") (Lucero, J., concurring in part and dissenting in part) (internal quotation marks and citations omitted).

On balance, considering the burden Garbett faced and the State's interest in not lowering ballot access standards, the court believes the circumstances warrant a different remedy. Although the court declines to enjoin the enforcement of Utah's 28,000-signature requirement entirely, the court will enjoin its enforcement on a pro rata basis.[131]

During this election cycle, candidates had 103 days to collect signatures. However, it became clear on March 12 when Governor Herbert issued Executive Order 2020-2 that this would not be a normal election cycle. That Executive Order suspended the usual requirement that candidates must file their declarations of candidacy in person.[132] The stated rationale for the Order was that "[a] potential candidate may experience symptoms of COVID19 and choose to self-isolate as recommended by state and local authorities" and that "[t]o require a potential candidate to file a declaration of candidacy in person may directly conflict with the recommendation of state and local authorities that individuals experiencing symptoms of COVID-19 self-isolate as necessary to prevent further transmission of the disease."[133] That same rationale would counsel against requiring candidates to continue efforts to gather signatures, which would undoubtedly contribute to the transmission of COVID-19.

One way the State could have narrowly tailored its election framework in response to the COVID-19 pandemic would have been to reduce the number of required signatures proportional to the time lost for signature-gathering due to health concerns. Using March 12 as an appropriate day for calculating lost time, thirty-three days were unavailable to candidates between March 12

---

[131] Other courts considering the appropriate remedy for ballot access challenges in light of the COVID-19 crisis have similarly reduced signature requirements. *See Esshaki*, 2020 WL 1910154, at *10 (finding it "appropriate to enjoin [Michigan] from rigid application" of the signature gathering statutes and reducing the threshold to fifty percent of its usual level); *Faulkner v. Va. Dep't of Elections*, CL 20-1456 (Va. Cir. Ct. Mar. 25, 2020) (reducing the signature requirement sixty-five percent in light of the COVID-19 pandemic).

[132] *See* Dkt. 21, Ex. F.

[133] *Id.*

and the April 13 deadline.  Thus, to appear on the ballot, the court will require Garbett to produce sixty-eight percent of the normal signature requirement, which amounts to 19,040 qualifying signatures.  This remedy discounts the thirty-three days Garbett lost as a result of the State's response to the COVID-19 pandemic and proportionally reduces the 28,000-signature requirement.

Given the expedited proceedings, the limited record, and the once-in-a-generation circumstances presented here, this remedy is as precise as is reasonably practicable.[134]  It does not fully account for the fact that the final weeks Garbett lost on the back end of her signature-gathering efforts ordinarily would have been more valuable than time lost earlier, given the exponential nature of signature-gathering.  The court recognizes that all days are not equal in a usual signature-gathering campaign.  On the other hand, the court's approach provides Garbett credit for signatures collected even after the Governor issued Executive Order 2020-2, and arguably before her efforts were most significantly burdened.  But the court believes the remedy provided strikes an appropriate, if imperfect, balance between the burdens imposed on Garbett and the compelling State interests.  Accordingly, if Garbett surpasses 19,040 valid signatures after the State conducts its review, the court directs the State to include Garbett's name on the Republican primary ballot.

## VI.    Security

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongly enjoined or restrained."[135]   Under this rule, courts have "wide

---

[134] *See Esshaki*, 2020 WL 1910154, at *11 (noting that fashioning an equitable remedy related to signature gathering "inevitably involves some degree of arbitrariness").

[135] Fed. R. Civ. P. 65(c).

discretion" in determining the appropriate level of security necessary to compensate a wrongfully enjoined party.[136]  Here, the State agrees with Garbett that no bond should be required if the court issues a decision before the date by which the State is required to certify the names that will be printed on primary ballots.  Because this decision issues before the State submits the certified ballot to the county clerks for printing, the court will not require Garbett to provide security.

## CONCLUSION

For the reasons explained above, the court concludes Garbett has satisfied her heavy burden to obtain a preliminary injunction.  Accordingly, her Motion is GRANTED IN PART and the court ORDERS as follows:

1. Only as to Jan Garbett and only for the current election cycle, the court partially enjoins enforcement of Utah Code § 20A-9-408(8)(b)(i) and reduces the numerical requirement contained therein by 32% to 19,040 signatures.

2. No later than Tuesday, April 28, 2020, at 10 a.m., Garbett shall submit to the Lieutenant Governor's Office the same packet of signatures she previously tried to deliver (*i.e.*, no more than 20,874 signatures).

3. The Lieutenant Governor's Office shall accept Garbett's signatures and immediately begin verifying how many are valid.  The Lieutenant Governor's Office shall employ the same procedures used to evaluate the signatures submitted by other candidates after Executive Order 2020-8 issued.  Accordingly,

---

[136] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1214 (10th Cir. 2009) (quoting *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)).

the court enjoins enforcement of Utah Admin. Code R. 623-4-4(A)(5)(b) only as to Jan Garbett during the present election cycle.

4. The Lieutenant Governor's Office shall notify Garbett and the court immediately when either:

     o   The Office certifies Garbett has 19,040 valid signatures; or

     o   Garbett is mathematically eliminated from the 19,040-signature threshold.

           ▪   Even if the Office determines Garbett has been mathematically eliminated from reaching 19,040 signatures, the Office shall as quickly as reasonably practicable continue to verify all signatures Garbett submits to arrive at the total number of valid signatures.

5. The court extends from April 29, 2020, to May 6, 2020, the deadline by which the Lieutenant Governor's Office must certify the names of the Republican candidates for governor that will appear on the primary ballot.  The April 29, 2020 deadline is unaffected as to all other races and candidates.

6. The court extends from May 15, 2020, to May 22, 2020, the State and Federal deadline by which counties must deliver ballots to overseas and military voters.

SO ORDERED this 29th day of April 2020.

BY THE COURT:

_____

ROBERT J. SHELBY
United States Chief District Judge